**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ELI WAGSCHAL

      Plaintiff,

   -against-

JAMES SKOUFIS, in his individual and official
capacities as a New York State Senator and former
Assemblyman,

      Defendant.

No.19 Civ. 2393 (CM)

## MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY

McMahon, C.J.:

      This free speech case arises from the deep well of resentment and animosity offered up on

social media platforms every day, a drop of which was exchanged between Plaintiff Eli Wagschal, a

private citizen, and Defendant James Skoufis, Mr. Wagschal's elected representative in the New

York State Senate. After Wagschal accused Skoufis of condoning racism and antisemitism on

Facebook, Skoufis blocked Wagschal from posting on the Senator's official page. Wagschal now

seeks declaratory and injunctive relief, as well as monetary damages under 42 U.S.C. § 1983, which

he believes are necessary to vindicate his First Amendment right to engage in public debate on the

Senator's page. (*See generally* Dkt. No. 1, Complaint.)

      Before the Court are Defendant's motion to dismiss the complaint for lack of subject matter

jurisdiction, and his motion for summary judgment on the ground of qualified immunity. (Dkt. No.

12.) Skoufis first argues that this case is no longer justiciable, since Skoufis unblocked Wagschal

nearly one year ago. Defendant further claims that his actions are protected by qualified immunity,

since it was objectively reasonable for him to believe that his actions were not in violation of clearly established law when he blocked Wagschal in August of 2018.

For the reasons that follow, Defendant's motions are granted.

**BACKGROUND**

**A.    Facebook**

Facebook is a website and social media platform that allows billions of users worldwide to connect with one another by posting messages and photos, responding to messages and photos shared by other users, and interacting with other Facebook users in relation to those posts.  (Dkt. 1, Compl. ¶ 11-12.)  Each Facebook user has an account, and each account corresponds to a "profile" on the platform, to which users publish their posts.  Users may also publish posts to Facebook "pages" or "groups," which are administered either by individuals or sets of Facebook users.

In the case of certain public figures, celebrities, or corporate brands, Facebook displays a blue checkmark to indicate that Facebook has verified that the particular profile, page, or group is the authentic Facebook presence of the person entity in question.  (*Id.* ¶ 18.)

Facebook offers a number of functions to facilitate communication between users.  Users can "follow" another user, and "subscribe" to that user's posts, so that they can view all of a particular user's posts in their "timeline."  (*Id.* ¶ 14.)  Users may also "reply" or "react" by leaving a comment or graphic in response to the original post, or "share" the original post on their own user profile.  (*Id.* ¶¶ 15-17.)

Each user also has the ability to restrict access to their posts by adjusting the privacy settings on their profile, page, or group.  (*Id.* ¶ 19.)  For example, users can block individuals from commenting their posts, reacting to their posts, or sharing their posts. (*Id.*)  A blocked user is still able to view pages that are public, but cannot interact with them further.  (*Id.*) Facebook also allows users to hide or delete comments posted on their pages by other users. (*Id.* ¶ 38.)

**B.    The Parties' Relevant Facebook Activities**

At all relevant times, Senator Skoufis maintained a verified Facebook page bearing a blue checkmark, which now identifies its user as "James Skoufis, Senator for New York's 39th District." (Compl. ¶¶ 21-22.)[1]  During his campaign for that office, then-Assemblyman Skoufis "used the Facebook Page to influence the decision-making process of the voters within the 39th [State Senate] District by promoting his positions on policy issues." (Compl. ¶ 27.)

Skoufis's page was and is "open and viewable to all registered FB users," even if they have been blocked from the page, "as well as to individuals who do not have a [Facebook] account." (*Id.* ¶ 23.)  The page does not contain a disclaimer or provide notice of "what topics or subject matter[s] may be discussed, what speech is subject to removal, or what online conduct may result" in users being banned from the page. (*Id.* ¶ 25.)  According to Wagschal, Skoufis uses his FB page in his official capacity to "communicate information to (and receive comments from) individuals about a variety of topics, such as local and state developments, politics, and about his policies." (*Id.* ¶ 24.)

During his run for State Senate in the summer and fall of 2018, Skoufis made several statements on his Facebook page regarding the Hasidic Jewish community in the 39th District.  For example, on August 3, 2018, Skoufis published a link to an article in the *Times Herald-Record*, entitled "Hasidic property owners seek to form new village," (*available at*, https://www.recordonline.com/news/20180802/hasidic-property-owners-seek-to-form-new-village), which detailed a petition signed by more than one hundred Hasidim seeking to form a new village from land that was at the time part of the Town of Monroe, New York, (*see* Dkt. 22, Diamond Decl. Ex. F).  The article reported on the Hasidic community's efforts to annex 1.7 square miles of Monroe

---

[1] Senator Skoufis' FB page can be accessed at www.facebook.com/JamesSkoufis/. (*Id.* n. 1.)

to create the proposed Village of Be'er Sheva so that their community could maintain control over local zoning laws.  (*Id.*)

In the post sharing the link, Skoufis called the Hasidic community's expansion effort "nothing but a revenge-fueled attempt to inflict harm on the people of Monroe and Orange County."  (*Id.* Ex. E.)  He described the annexation efforts as a "shameful" demonstration of a "complete lack of regard for the broader community" and promised to "fight every step of the way to stop this disgraceful, offensive proposal." (*Id.*)

Skoufis's post elicited hundreds of comments, responses, and reaction, many of which Wagschal found offensive.  (Compl. ¶ 33.)  For example, users responding to the August 3, 2018 post referred to the Hasidic community as a "CURSE [sic]," a "cult," "cancer," and "bigoted"; one user wrote that new laws "need to be enacted [to] limit how many children [the Hasidim] actually have." (*Id.*)

Shortly thereafter, Wagschal confronted Assemblyman Skoufis about other users' comments on the original post, calling the comments racist and antisemitic. Wagschal first commented, "Dear Assemblyman, your lack of protesting the flagrant racism on this thread is equivalent to an endorsement." (Compl. ¶34; *see also* Diamond Decl. Ex. D.)  Over the next two days, Wagschal commented three more times on Skoufis's post, imploring the assemblyman "to condemn these ugly comments you've instigated." (Compl. Ex. B.)

Skoufis never responded directly to Wagschal's comments.  On or around August 5, 2018, Skoufis blocked Wagschal from interacting with the assemblyman's official page.  (Compl. ¶ 38.) Wagschal alleges in his Complaint that this block prevented him "from participating in the Senator's posts and engaging in discussion with other constituents."  (*Id.*)

4

**C.      Plaintiff Files the Complaint and the Parties Engage in Limited Pre-Motion Discovery.**

Assemblyman Skoufis was elected to the New York State Senate on November 6, 2018.  *See* Certified Results from the November 6, 2018 General Election for NYS Senate, *available at* https://www.elections.ny.gov/NYSBOE/elections/2018/general/2018NYSenate.pdf (last visited Feb. 11, 2010).[2]

On March 18, 2019, Wagschal filed the Complaint in this action under 42 U.S.C. § 1983, asserting claims against Skoufis in this official and individual capacities for violating Wagschal's First Amendment rights by blocking Wagschal from the Facebook page. (Compl. ¶¶6-7, 40-43). Wagschal claims that Senator Skoufis's imposed viewpoint-based restrictions on his speech in a public forum (*Id.* ¶¶ 41-43), and thus seeks: (i) a declaration that Senator Skoufis's ban was unconstitutional; (ii) an injunction directing the Senator to unban Wagschal restraining any further ban with respect to the Senator's page; (iii) unspecified compensatory damages; (iv) attorney's fees, costs, and expenses: and (iv) punitive damages in an unspecified amount. (Compl. at 14 (Prayer for Relief).)

After this action commenced, but before May 29, 2019, Senator Skoufis unblocked Wagschal, as evidenced by comments Wagscgal was permitted to make on one of Senator Skoufis's posts addressing the annexation efforts.  (*See* Diamond Decl. Ex. D, Dep. Tr. of E. Wagschal, at 97:25, Exs. I, J, L & M.)

On August 1, 2019, Senator Skoufis requested an extension of the deadline for briefing his motion to dismiss, in order to take the pre-answer deposition of the Plaintiff.  In cases where qualified immunity may impose a total bar to any recovery, this court requires "the defendant(s) to

---

[2] This Court may take judicial notice of election outcomes as reported in government documents.  *See Latifi v. Gonzalez*, 430 F.3d 103, 106 n.1 (2d Cir. 2005).

depose the plaintiff before filing a pre-discovery motion." (McMahon Individual Practices and Procedures § V.E.4.)

During that deposition, which occurred on September 26, 2019, Wagschal admitted that he had commented on the Senator's page on June 7, June 19, June 23, and June 24, 2019. (Diamond Decl. Ex. D, at 101:20–112:23 ("I did not have any trouble posting since at least May 29 until today."); Exs. J, K, L, & M.) Plaintiff further admitted that he had not been banned from Skoufis's page as of May 29, 2019. (Diamond Decl. Ex. D, at 112:14-23.)

Following Wagshal's deposition, Senator Skoufis filed the pending motions. Following a brief introduction to recent precedent in this newly-emerging area of First Amendment law, Defendant's motions are disposed of below.

## RELEVANT LAW

Courts have recently begun to grapple with the First Amendment issues that arise from social media accounts maintained by public officials.

As a general matter, the Supreme Court has made clear that social media sites, despite being maintained by privately-held companies, offer their users the chance to "engag[e] in the legitimate exercise of First Amendment rights." *Packingham v. North Carolina*, 137 S.Ct. 1730, 1737, 198 L.Ed.2d 273 (2017).

Two years ago, in *Knight First Amendment Institute at Columbia University v. Trump*, 302 F. Supp. 3d 541 (S.D.N.Y. 2018) ("*Knight I*"), my colleague, the Hon. Naomi Reice Buchwald, was the first federal judge to consider whether "a public official may, consistent with the First Amendment, 'block' a person from [accessing the official's social media account] in response to the political views that person has expressed." *Id.* at 549 (quotation marks in original). The claims in *Knight I* stemmed from interactions on Twitter, another social media platform which, like Facebook, allows users to create comment threads that appear beneath an original post (both posts and subsequent

comments on Twitter are referred to as "tweets"). The plaintiffs in *Knight I* used Twitter to criticize either President Donald J. Trump or his policies in response to one of the President's tweets; each plaintiff was blocked from replying to or viewing the President's tweets as a result. *Id.* at 553. The plaintiffs in *Knight I* remain blocked for the entirety of the case.

The complaint in *Knight I* sought declaratory and injunctive relief from the President and certain of his White House aides. *Id.* at 555. The parties cross-moved for summary judgment on a set of stipulated facts, with the President and his aides arguing that the plaintiffs had not engaged in protected speech, that there was no constitutional right to be heard by the President, and, in the alternative, that the decision to block the plaintiffs was government speech beyond the scope of the First Amendment. None of the defendants in *Knight I* raised qualified immunity as a ground for dismissal, because plaintiffs were not seeking monetary damages.

As an initial matter, Judge Buchwald addressed "irreducible constitutional minimum" necessary to establish subject matter jurisdiction: standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). Plaintiffs must satisfy three requirements to establish standing under Article III: First, "plaintiff must have suffered an 'injury in fact' — an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," *id.* (internal citations omitted); second, plaintiff must show a "causal connection between the injury and the conduct complained of,' *id.*; finally, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision," *id.* The court in *Knight I* concluded that plaintiffs had established injury since their "ability to communicate using Twitter ha[d] been encumbered" with respect to the President's tweets, and "as long as the individual plaintiffs remain blocked, their ability to communicate using Twitter will be so limited." *Id.* at 557. The court further found causation and redressability satisfied since the parties had stipulated that the President had blocked each plaintiff, and that "Any declaratory or injunctive

relief as to [the President's aid who maintained the President's twitter account] that results in the unblocking of the individual plaintiffs will redress at least some of their future injury, regardless of whether the President could, theoretically, reblock them subsequently." *Id.* at 562.

Having found that plaintiffs had standing to pursue their claims, Judge Buchwald turned to "the First Amendment's application to the distinctly twenty-first century medium of Twitter," which required her to determine: (i) whether the plaintiffs' interactions with the President's tweets were protected speech; (ii) whether the President's Twitter account was a forum subject to First Amendment protection; (iii) which type of forum analysis would apply to Twitter were it deemed a forum; and (iv) if the President's decision to block the plaintiffs from viewing his account was impermissible viewpoint discrimination.

On the first question, the court concluded that plaintiffs' responses to the President were "political speech . . . on matters of public concern" and, thus, their activities "fall within the core of First Amendment Speech." *Id.* at 565 (quoting *Engquist v. Ore. Dep't of Agric.*, 553 U.S. 591, 600 (2008)). Then the Court analyzed the "interactive space associated with each of the President's tweets," and found that the "subsequent dialogue in the comment thread" over each tweet was not "government speech" and so was "properly analyzed under the Supreme Court's forum precedents." *Id.* at 565-573.

Next, the Court considered several types of forum analysis that might apply to the President's replies, and determined that "designated public forum" doctrine – which governs public spaces that "the state has opened for use by the public as a place for expressive activity – was most appropriate. *Id.* at 574.

Finally, Judge Buchwald found that restricting the plaintiffs' right to speak in direct response to the President's tweets, when others were allowed to engage in the same activity in the same forum (albert while expressing different political views), was presumptively impermissible viewpoint

discrimination. *Id.* at 575. The Court granted an injunction and declaratory relief that required the President to unblock the Plaintiffs.

The Second Circuit affirmed all four of the lower court's holdings on July 9, 2019 – at least two months after Skoufis unblocked Wagschal. *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) ("*Knight II*"). Accordingly, it is now the law of this Circuit that: (i) social media activity "is entitled to the same First Amendment protections as other forms of media," *id.* at 237; (ii) a public official's social media account, to the extent "intentionally opened for public discussion," "repeatedly used . . . as an official vehicle for governance," and "accessible to the public without limitation" is a type of public forum; and (iii) "the First Amendment does not permit a public official who utilizes a social media account for all manner of official purposes to exclude persons from an otherwise–open online dialogue because they expressed views with which the official disagrees." *Knight II*, 928 F.3d at 230.[3]

## DISCUSSION

The parties agree that the type of injury alleged in *Knight I* is substantially similar to that set out in Wagschal's complaint. That agreement is consistent with several recent district court decisions, which have found standing in cases bringing First Amendment challenges to official conduct on social media platforms. *See, e.g. Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019); *Garnier v. Poway Unified School Dist.*, No. 17-cv-2215, 2019 WL 4736208 (S.D. Cal. Sept. 26, 2019); *Campbell v. Reisch*, No. 18-cv-4129, 2019 WL 3856591 (W.D. Mo. Aug. 16, 2019).

Senator Skoufis argues two grounds for dismissal for lack of subject matter jurisdiction under Rule 12(b)(1). First, he argues that actions taken in his official capacity may not give rise to claims for monetary relief under the state sovereign immunity doctrine. Second, by unblocking Wagschal

---

[3] *Knight II* is consistent with the Fourth Circuit's decision in *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019), which affirmed a lower court's determination that a school board's decision to block public comments on its Facebook page constituted an infringement of First Amendment rights.

and removing his alleged injury in fact, Skoufis has mooted Plaintiff's claims for declaratory and injunctive relief, thereby denying Wagschal standing to pursue equitable remedies.

Separately, Skoufis has moved to dismiss for failure to state a claim on the basis of qualified immunity under rule 12(b)(6). According to Defendants, Skoufis may not be held liable for blocking Wagschal's right to comment on the Senator's Facebook page, because: (i) Plaintiff did not enjoy a clearly established First Amendment right to interact with the Senator's posts at the time he was blocked; and (ii) it was objectively reasonable for Skoufis to believe that his conduct was lawful under the circumstances. Under this Court's Rules, any pre-answer or pre-discovery motion to dismiss on the basis of qualified immunity is converted to a motion for summary judgment, with the factual record limited to the Complaint and the Plaintiff's deposition.

# I. DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION IS GRANTED.

## A. Legal Standard for Dismissal Under Rule 12(b)(1)

"Article III of the Constitution limits federal 'judicial Power,' that is, federal-court jurisdiction, to 'Cases' and 'Controversies.'" *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 395 (1980). A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. *See* Fed.R.Civ.P. 12(b)(1). Plaintiff bears the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. *See Malik v. Meissner,* 82 F.3d 560, 562 (2d Cir.1996). In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court may refer to evidence outside the pleadings. *See Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986).

"[A]t all times, the dispute before the court must be real and live, not feigned, academic, or conjectural." *Russman v. Bd. of Educ.*, 260 F.3d 114, 118 (2d Cir. 2001). "When the issues in dispute

between the parties 'are no longer live,' a case becomes moot." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 84 (2d Cir. 2005) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). Therefore, even if standing exists when the plaintiff files the complaint, this Court lacks subject matter jurisdiction if it concludes that the case is moot. *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135, 140 (2d Cir. 1994).

**B.  Plaintiffs' Claims Seeking Declaratory and Injunctive Relief Are Moot.**

The parties do not dispute that Wagschal had standing at the time he filed his complaint in March of 2019.  But that does not mean that the case is presently justiciable.  Rather, Skoufis asks this Court to dismiss Plaintiff's claims for equitable remedies on mootness grounds.  Skoufis claims that this Court lacks subject matter jurisdiction, "because plaintiff concedes that months ago Senator Skoufis unblocked his access to the Senator's [Facebook] page and simultaneously restored [Wagschal's] comments to the page that were purportedly blocked."  (Dkt. No. 21, Def.'s Br. at 12.)

The defendant's voluntary cessation of allegedly unlawful conduct renders a cause of action moot if "the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Lamar Adver. of Penn, LLC v. Town of Orchard Park, N.Y.*, 356 F.3d 365, 375 (2d Cir. 2004) (quoting *Granite State Outdoor Adver. v. Town of Orange, Conn.*, 303 F.3d 450, 451 (2d Cir. 2002)).  Even though "a defendant's 'voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice,' it is nonetheless 'an important factor bearing on the question whether a court should exercise its power' to entertain a request for injunctive relief or declare it moot." *Holland v. Goord,* 758 F.3d 215, 223 (2d Cir.2014) (quoting *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982)).  And, when a government defendant like Skoufis makes "representations that

certain conduct has been discontinued," they are entitled to "some deference." *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 59 (2d Cir. 1992).

However, a government defendant claiming mootness on the basis of voluntary cessation still "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 603–04 (2d Cir. 2016) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 190 (2000)).

1.  **There is no reasonable expectation that Skoufis will attempt to block Wagschal in the future.**

The parties do not dispute that Skoufis unblocked the Plaintiff at least nine months ago. Moreover, the Senator has made clear to this Court that he "does not intend to ban or block plaintiff's access to [the Senator's Facebook] page again at any time in the future." (Dkt. No. 21, Def.'s Br. at 10.)  While that representation, standing alone, might not be enough to moot this case, the totality of circumstances since Wagschal filed his complaint indicate that Senator Skoufis has learned his lesson.

The Second Circuit's decision in *Dean v. Blumenthal*, 577 F.3d 60 (2d Cir. 2009) is instructive.  There, the plaintiff, a candidate for public office, alleged that Attorney General Richard Blumenthal's interpretation of a provision in his office's standard contract with private law firms violated her First Amendment right to receive campaign contributions from law firm employees covered by the provision. *Id.* at 63.  Specifically, Blumenthal adopted a policy, embodied in the challenged provision, that forbid any employee of a law firm contracting with his office (or their spouses) to donate to any political campaign during the contract term. *Id.*  After the complaint was filed, but before Blumenthal moved to dismiss, he stopped enforcing the provision, thus abrogating the policy.  Although the language remained in the standard contract for four more years, the attorney

general never again enforced it, and, eventually, he removed the provision altogether two years prior to the appellate court's decision.  *Id.*

In affirming the district court's ruling that the plaintiff's claims for declaratory and injunctive relief were moot, the Second Circuit found the following factors persuasive: (1) the undisputed fact that attorney general was no longer engaging in the purportedly unconstitutional conduct; (2) his "consistent and voluntary" refusal to enforce the provision once he ceased to do so; and (3) "his representations that he ha[d] no intention to re-implement the practice."  *Id.* at 65-66.  In light of those facts, the Second Circuit saw no "reasonably concrete basis to anticipate" that the attorney general would reimpose the restriction "in a form that will raise the same questions." *Id.* at 65 (quoting 13C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3533.6 (3d ed. 2008)).

For similar reasons, this Court reaches the same conclusion with respect to Senator Skoufis. As in *Blumenthal*, both parties agree that Senator Skoufis terminated the conduct giving rise to this case long before filing the present motion.  (*See* Def.'s Br. at 9-10; Diamond Decl. Ex. D, Dep. Tr. of E. Wagschal, at 97:25, Exs. I, J, L & M.)  As in *Blumenthal*, Senator Skoufis has refrained from any further violations, or perceived violations, consistently and voluntarily, allowing Wagschal to interact with his official Facebook page during the entire pendency of this action without the Senator taking further steps to restrict access to the page.  (Diamond Decl. Ex. D, at 112:14-23.)  And, finally, Senator Skoufis "is entitled to deference with respect to [his] assurances" that he has no intention of resuming his offending conduct.  *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 111 (2d Cir. 2010); *see also Granite*, 303 F.3d at 451-2.

Besides, "a defendant cannot reasonably be expected to resume conduct that it acknowledges is contrary to binding precedent." *Berman v. New York State Pub. Employee Fed'n*, No. 16-cv-204, 2019 WL 1472582, at *3 (E.D.N.Y. Mar. 31, 2019) (citing *Granite*, 303 F.3d at 451–52); *see also*,

*Carlson v. United Acads.*, 265 F.3d 778, 786 (9th Cir. 2001) ("It is unreasonable to think that the Union would resort to conduct that it had admitted in writing was constitutionally deficient and had attempted to correct."). Here, the Senator admits that the Second Circuit's decision in *Knight II* prohibits public officials from engaging in the types of social media practices that give rise to this action. (Def. Br. at 21.)

There is no controversy regarding the Senator's current conduct, nor is it reasonable to expect that one might arise. As courts in this Circuit have held, it is inappropriate for Court's to revive a moot case by speculating about a defendant's future actions. *See, e.g.*, *Jones v. Goord*, 435 F. Supp. 2d 221, 256 n. 36 (S.D.N.Y. 2006) (refusing to "project" that plaintiff might someday be subject to same unlawful conduct that defendants had voluntarily ceased); *Bandler v. Town of Woodstock*, No. 2:18-CV-00128, 2019 WL 5616956, at *8 (D. Vt. Oct. 31, 2019) (claim based on "conjecture" that unlawful conduct might recur was "too speculative for Article III purposes"). Accordingly, Skoufis has established the first prong of voluntary cessation necessary for a finding of mootness.

## 2. Interim events have completely and irrevocably eradicated the effects of the the alleged violation.

The record also shows that Senator Skoufis has eradicated the past effects of his conduct as challenged by Wagschal.

In his opposition to the Defendant's motion to dismiss, Wagschal claims that "the [August 3, 2018] comments subject to this litigation are still hidden," and, therefore, Skoufis has yet to "completely and irrevocably eradicate" the effects of the challenged conduct. (Dkt. No 27, Pl.'s Opp. at 33.) However, at the pre-motion deposition, Defendant's attorneys presented Wagschal with exhibits displaying his comments beneath the Senator's posts to demonstrate that Wagschal was, in fact, unblocked. (Diamond Decl. Ex. D, at 92:17–93:22, 94:13–96:8.) Plaintiff admitted that his comments were in fact visible on the Senator's page. (*Id.*)

Nonetheless, Plaintiff insists in his opposition papers that "the comments subject to this litigation are still hidden." (Pl.'s Opp. at 10.) "Hidden" comments on Facebook are only visible to the original poster and the author of the comment – not the general public. While the Senator claims the he incorrectly assumed unblocking Wagschal would also unhide his comments, (Dkt. No. 29, Skoufis Reply Decl. ¶¶ 10–11), that distinction is of little consequence – because Plaintiff neither alleged, nor does the precedent of this Circuit recognize, a right to display comments on a public official's social media page. As the Judge Buchwald held in *Knight II*, the First Amendment only protects "the blocked user's right to speak in a discrete, measurable way." *Knight I*, 302 F. Supp. 3d at 577. A public official may choose to "selectively amplify the voices" of certain users while hiding – or in the case of Twitter, muting – the voices of others. *Id.*

In any event, the Senator unhid the comments before this motion was fully briefed. (*Id.* ¶ 15.) In light of the Senator's recent actions, "prospective injunctive relief sought . . . will [not] provide the . . . plaintiffs . . . with any legally cognizable benefit," *Byrd v. Goord*, No. 00-cv-2135, 2007 WL 2789505, at *3 (S.D.N.Y. Sept. 26, 2007), and Plaintiff's claims for such relief must be dismissed as moot.

## C. State Sovereign Immunity Bars Plaintiff's Claim for Damages Arising from Skoufis's Official Capacity Conduct.

A plaintiff may not recover monetary damages for actions taken by government actors in their official capacity. That is because the Supreme Court has held that "neither a State nor its officials are 'persons' under § 1983." *Gaby v. Bd. Of Trustees of Comm. Tech. Colleges*, 348 F.3d 62, 63 (2d Cir. 2003) (quoting *Will v. Mich. Dept. of State Police.*, 491 U.S. 58, 71 (1989)). Rather, such suits are "no different from a suit against the State itself," and are thus barred by the doctrine of state sovereign immunity enshrined in the Eleventh Amendment. *Chris H. v. N.Y.*, 764 Fed. Appx. 53, 55

(2d Cir. 2019) (quoting *Will*, 491 U.S. at 71).  Wagschal's claims for monetary damages arising from Senator Skoufis's official capacity conduct are therefore dismissed.

## II.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY IS GRANTED.

The Court next turns to Plaintiffs' claim for damages for Skoufis's actions taken in his individual capacity.  The Senator's motion seeks dismissal of that claim under the doctrine of qualified immunity, which "protects government employees from civil liability where performance of their discretionary functions does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In *Stephenson v. John Doe*, 332 F.3d 68 68 (2d Cir. 2003), the Second Circuit explained that when determining a motion to dismiss on qualified immunity grounds in advance of full merits discovery, the plaintiff's version of the facts (in this case, elaborated in his deposition testimony) is assumed to be true. *See also Espinoza*, 2012 WL 4761565, at *3. The truth of the plaintiff's allegations is assumed "without regard to any objection defendants may have to the truth of plaintiff's version of events." *Quezada v. Roy*, No. 14–cv–4056, 2015 WL 5970355, at *10 (S.D.N.Y. Oct. 13, 2015); *see also Tellier v. Fields*, 280 F.3d 69, 74 (2d Cir. 2000); *Plunkett v. City of N.Y.*, No. 10–cv–6778, 2011 WL 4000985, at *6 (S.D.N.Y. Sept. 2, 2011). In deciding the issue of qualified immunity, "the defendant['s] version of the facts is absolutely irrelevant." *Bolden v. Vill. of Monticello*, 344 F.Supp.2d 407, 411 (S.D.N.Y. 2004). Accordingly, this Court does not take testimony from defendants or otherwise consider their version of events. *Quezada*, 2015 WL 5970355, at *11.

In order to shield government employees from lengthy litigation, courts often decide the issue of qualified immunity at the earliest possible opportunity, ideally at "a point at which plaintiff's well pleaded allegations are assumed to be true, and defendant's version of the facts is immaterial." *Espinoza v. City of N.Y.*, No. 11–cv–2108, 2012 WL 4761565, at *3 (S.D.N.Y. Aug. 3,

2012). As it did in this case, this Court often permits the government defendants to depose the Plaintiff so that the testimony may be utilized at this stage to amplify and further explain the allegations in the complaint.

The court then assesses the defendant's motion to dismiss as a motion for summary judgment. Under Federal Rule of Civil Procedure 56, the Court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The Court views the record in the light most favorable to the non-movant and resolves all ambiguities and draws all reasonable inferences against the movant. *Donahue v. Windsor Locks Bd. of Fire Commn'rs,* 834 F.2d 54, 57 (2d Cir. 1987).

## A.  Legal Standard Governing a Pre-Discovery Motion on the Grounds of Qualified Immunity

When presented with a qualified immunity defense, a district court engages in the two-prong inquiry set out by the Supreme Court in *Saucier v. Katz,* 533 U.S. 194 (2001): (1) the court should first determine whether the plaintiff alleged facts sufficient to demonstrate a violation of a constitutional right; and (2) if so, the court should then decide whether the right was "clearly established" at the time of the alleged misconduct. *Id.* at 201. The defense is available as long as reasonably competent officials could disagree about whether the conduct at issue would violate clearly established rights. *Cartier v. Lussier,* 955 F.2d 841, 846 (2d Cir. 1992); *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The qualified immunity doctrine is "evaluated in the contest of legal rules that were 'clearly established' at the time" of the alleged violation. *Foe v. Leonard*, 282 F.3d 123, 132 (2d Cir. 2002).

District courts are to "exercise their sound discretion in deciding which of the two prongs . . . should be addressed first in light of the circumstances of the particular case at hand." *Pearson v.*

*Callahan*, 555 U.S. 223, 236 (2009). In focusing on the "clearly established" prong, court may "avoid the '[u]nnecessary litigation of constitutional issues' at step one." *Francis v. Fiacco*, 942 F.3d 126, 140 (2d Cir. 2019) (quoting *Pearson*, 555 U.S. at 237).

**B.     Skoufis's Decision to Block Wagschal from the Senator's Facebook Page Did Not Violate Clearly Established Law.**

At the time Skoufis blocked Wagschal from commenting on the Facebook page – August 3, 2018 – his action did not violate clearly established law.

Wagschal is not required to find "a case directly on point for a right to be clearly established"; however there must be some "existing precedent [that has] placed the statutory or constitutional question beyond debate." *White v. Pauly*, ––– U.S. ––––, 137 S. Ct. 548, 551, 196 L.Ed.2d 463 (2017) (per curiam) (internal quotation marks, citation, and brackets omitted). That precedent "must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, ––– U.S. ––––, 138 S. Ct. 577, 590, 199 L.Ed.2d 453 (2018). Moreover, the Supreme Court has "repeatedly told courts ... not to define clearly established law at a high level of generality," *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1775–76, 191 L.Ed.2d 856 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)), instead emphasizing that "clearly established law must be 'particularized' to the facts of the case," *White*, 137 S. Ct. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In short, qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and "protects 'all but the plainly incompetent or those who knowingly violate the law.' " *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

A legal principle is clearly established in the qualified immunity context either when supported by "controlling authority" or a "robust 'consensus of cases of persuasive authority.'" *al-*

*Kidd*, 563 U.S. at 742 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). For controlling authority, this Court generally "look[s] to Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right." *Okin v. Vill. of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 433 (2d Cir.2009). When consulting persuasive authority, even if the Second Circuit "has not explicitly held a course of conduct to be unconstitutional, [this Court] may nonetheless treat the law as clearly established if decisions from this or other circuits clearly foreshadow a particular ruling on the issue." *Terebisi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014); *see also Gorman v. Rensselaer Cty.*, 910 F.3d 40, 45 (2d Cir. 2018). While the Supreme Court has implied on a number of occasions over the last decade that circuit precedent alone may be insufficient support for a finding of "clearly established law," but it has never explicitly held as much. *See, e.g.*, *Carroll v. Carman*, 574 U.S. 13, 17 (2014) ("Assuming for the sake of argument that a controlling circuit precedent could constitute clearly established federal law . . ."); *Riechle v. Howards*, 566 U.S. 658, 665-66 (2012) (same). For purposes of this motion, I will continue to follow *Okin*.

There was no controlling authority clearly establishing the right at stake in this case when Skoufis blocked Wagschal on August 3, 2018. Plaintiff concedes, as he must, that *Knight II* was the first time that either Second Circuit or the Supreme Court addressed the First Amendment implications of a public official blocking one of their constituents on social media. The only "controlling" authorities cited in his opposition are three Supreme Court cases dealing with public forum doctrine, but which have no connection to the "relatively new type of . . . platform" that gives rise to this dispute. *Knight II*, 928 F.3d at 230. All three, in fact, involved conduct taken on government property, as opposed to actions taken on private property (*i.e.* the platform maintained by Facebook, Inc.) that a government actor is using to carry out its public-facing functions. For example, the plaintiff in *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S.

788 (1985) challenged restrictions on a fundraising initiative "conducted in the federal workplace." *Id.* at 790. The decision in *International Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992) upheld a ban on solicitation in airport terminals owned and operated by a state agency. And *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009) dealt with the disposition of land in public parks. *Id.* at 464.

Indeed, *Krishna Consciousness* makes clear why none of these cases is "controlling" here: "When new methods of transportation develop . . . it therefore will be a new inquiry whether the transportation necessities are compatible with various types of expressive activity." 505 U.S. at 681. Likewise with new forums for communication: the lengthy exploration undertaken by Judge Buchwald and ratified by the Second Circuit is proof that social-media-specific analyses are necessary to "clearly establish" the law in this area. *See, e.g.*, *Knight I*, 302 F. Supp. 3d at 570 (analyzing "the content of tweets, the timeline comprised of the account's tweets, and the interactive space of each tweet"). Because the purpose, structure, and intended use of charity drives, airports, and public parks are factually distinct from a private social media platform, the cases cited by Wagschal are not "clearly established law" that overcome the qualified immunity defense.

Wagschal next argues that "a robust consensus of cases of persuasive authority [holds] that viewpoint discrimination is not permitted by the government in any forum, public or otherwise." (Pl.'s Opp. Br. at 4.) Whether there is appellate-level precedent to support that broad proposition (Plaintiff's brief cites none), it does not follow that "particularized" persuasive authority exists to clearly establish the scope of First Amendment protections with respect to social media. Indeed, the stronger inference is that no federal appellate court had ruled in this area prior to Skoufis's actions, since Wagschal cites no such case, let alone one that "place[s] the statutory or constitutional question beyond debate." *Taylor v. Barkes*, 575 U.S. 822, 135 S.Ct. 2042, 2044 (2015).

The only case cited in Plaintiff's opposition brief in support of his "robust consensus" theory is a trial court opinion. In *Price v. City of New York*, No. 15-cv-5871, 2018 WL 3117507 (S.D.N.Y. June 25, 2018), my colleague, Judge Failla, granted qualified immunity to two City officials who blocked the plaintiff from responding to two publicly-administered Twitter accounts, while acknowledging that "viewpoint discrimination is unlawful in forums governed by the Free Speech Clause." *Id.* at *20. However, *Price* did not "clearly establish," let alone hold, that government officials are liable for damages under Section 1983 when they block a Twitter user from a government-controlled account. Rather, in a separate section of the opinion dismissing the plaintiff's failure to train claims against the City, the court noted that the lawsuit "may . . . place the City on notice of the need to train its employees" with respect to potential First Amendment violation. *Id.* But that is a far sight from saying that the law clearly forbids every government official from blocking users from social media accounts under every circumstance.

Even if *Price* and *Knight I* could qualify as two components of a "robust consensus" of persuasive authority, they would still be insufficient to satisfy the "clearly established law" requirement necessary to overcome Skoufis's qualified immunity defense. Two cases standing alone cannot form a "robust consensus of cases of persuasive authority." *Batt v. Buccilli*, No. 12-cv-1198, 2017 WL 1190487, at *8 (W.D.N.Y. Mar. 31, 2017) (quoting *Wilson*, 526 U.S. at 603); *see also Z.J. v. Kan. City Bd. Of Police Commissioners*, 931 F.3d 672, 690 (8th Cir. 2019) (Gruender, J., concurring in part and dissenting in part) ("Agreement between two other circuits does not constitute a robust consensus . . . ."). So even though *Price* was decided six weeks before Skoufis blocked Wagschal and was consistent with *Knight I*, those cases were the only two addressing the constitutionality of speech restrictions on social media by any federal court within this district or otherwise. That is not sufficient authority to "clearly establish" the right Wagschal asserts.

Nor does the narrow exception to the rule requiring on-point controlling or persuasive authority revive Plaintiff's claim that Skoufis violated "clearly established law." A plaintiff may overcome the qualified immunity defense in the absence of precedent only when the constitutional violation is "obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). However, the "obvious violation" exception does not apply in this case. As the Second Circuit noted, "Whether First Amendment concerns are triggered when a public official uses his [social media] account in ways that differ from those presented on this appeal will in most instances be a fact-specific inquiry." *Knight II*, 928 F.3d at 236. In other words, the body of First Amendment law governing public use of private communication platforms is just beginning to develop. It would be unreasonable for this Court to expose a public official to liability for this type of activity when so many issues of first impression remain, and so little about how courts should proceed in such cases is "obvious."

Therefore, Wagschal has failed to raise a genuine dispute that Skoufis violated "clearly established law" when the Senator blocked him on August 3, 2018. Given this absence of controlling or overwhelmingly persuasive precedent on the date of the purported violation, this Court finds that Skoufis is shielded by qualified immunity, and need not determine whether his conduct was objectively reasonable under the circumstances.

## CONCLUSION

Defendant's motion to dismiss is GRANTED.

Defendant's motion for summary judgment on the basis of qualified immunity is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. No. 20. This constitutes the written decision and order of the Court.

Dated: March 2, 2020

_____

Chief Judge

BY ECF TO ALL PARTIES